**Gilbert DIAS, Petitioner,**

v.

**Michael T. MALONEY, Respondent.**

**No. Civ.A. 00–10845–WGY.**

United States District Court,
D. Massachusetts.

Aug. 2, 2001.

Gilbert Dias, Concord, NH, pro se.

Michael T. Maloney, Department of Correction, Legal Division, Milford, MA, pro se.

Linda A. Wagner, Attorney General Office, Criminal Division, Boston, MA, pro se.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

Gilbert Dias ("Dias") was convicted of second-degree murder in 1975 and was sentenced to life in prison. He now petitions this Court, pro se, for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, claiming that the Commonwealth of Massachusetts is holding him in violation of the Constitution and laws of the United States.

## I. BACKGROUND

Over the past twenty-five years, numerous state and federal courts have addressed myriad challenges brought by Dias against his conviction. In order to place Dias's current petition in context, this Court will begin by summarizing what transpired at these earlier proceedings.

### A. Facts

On direct appeal, the Massachusetts Supreme Judicial Court fully summarized the evidence presented at trial against Dias. This Court adopts that recitation of facts, as is proper absent clear and convincing evidence that casts doubt on the state court's determination. *See* 28 U.S.C. § 2254(e)(1); *Hurtado v. Tucker*, 245 F.3d 7, 10 & n. 4 (1st Cir.2001); *Avellar v. DuBois*, 30 F.Supp.2d 76, 79 (D.Mass.1998) (Stearns, J.) (citing, inter alia, *Sumner v. Mata*, 449 U.S. 539, 545–46, 101 S.Ct. 764, 66 L.Ed.2d 722 [1981] ).

On the evening of March 15, 1974, the victim Gerald Travis (Travis), accompanied by Russell Greene (Greene), and Fernando Mello (Mello), went to a bar, The Republican Club, in Fall River. There the group met another friend, Thomas Wing (Wing). Each of them consumed several beers. In the course of the evening, the young men traveled to another bar where they continued their beer drinking and socializing until closing time, whereupon they proceeded to a third tavern, which had also closed. Not yet ready to call an end to the evening's activities, Mello's companions accepted his invitation to go to Dias's apartment; Mello, the only member of the group acquainted with Dias, had been staying at his apartment for several days prior to March 15.

Though no one was at home, the group entered the apartment, and, while Mello gave Wing and Greene a tour of the premises, Travis retired to the kitchen and began frying eggs and sausages. In the course of their tour, Mello happened on two shotguns leaning against the bureau in Dias's bedroom and a box of shotgun shells atop the bureau. One of the shotguns, from which the parties agree the fatal shot was fired, was capable of firing only once, and then had to be "broken open" to be reloaded. Although noticing that this gun was unloaded, Mello, wary that his friends might engage in horseplay, hid the gun under a couch in the livingroom and put the bullets in Dias's bureau.

Soon after, Dias returned to his apartment in the company of several friends. Except for Dias, no one in the group arriving was acquainted with any member of Mello's party. Dias appeared upset. According to various accounts, this was because he had lost his wallet, because of the unexplained presence of unknown persons who had placed the kitchen in a state of disarray, or because he could not locate his guns. At any rate, Dias found a gun and shells, loaded the gun, and came into the kitchen. He pointed the gun at Greene, and demanded that the premises be vacated.

There was a conflict in the testimony as to what transpired thereafter. Mello,

Greene, and Wing, whose accounts essentially coincided, testified that as Dias entered the kitchen the shotgun was in the "closed" position and the hammer was cocked. Greene pushed the barrel of the shotgun away from his face. At the same time, Travis jumped toward Dias, the lights went out momentarily, and Travis was fatally shot.

Michael Sturgeon (Sturgeon), the only defense witness, was in the group which accompanied Dias to the apartment.[1] He testified that as Dias came into the kitchen, the shotgun which he was brandishing was in the "broken" position, and thus could not be fired. According to his version, Travis jumped toward Dias, and, grabbing the shotgun by the barrel, tore it from the defendant's hand. Still holding the barrel, Travis swung the shotgun at Dias, attempting to use the butt end as a club. Dias put up his arm to fend off the blow, and, on contact, the shotgun slammed shut and accidentally discharged into Travis's chest area.

*Commonwealth v. Dias*, 373 Mass. 412, 413–15, 367 N.E.2d 623 (1977), *available at* Resp't's Ex. 5. A more detailed account of the facts is found in *Dias v. DuBois*, No. 93–12566, slip op. at 2–7 (D.Mass. Feb. 26, 1996) (Woodlock, J.), *available at* Pet'r's Ex. 18.

## B. Prior Proceedings

### 1. Trial

Dias was indicted on a charge of first degree murder and retained Kenneth Sullivan ("Sullivan"), an experienced and distinguished criminal lawyer,[2] to represent him at trial. Trial was held before the Honorable Vincent Brogna, Justice of the Superior Court. Justice Brogna summarized the facts at trial as follows:

The defendant did not testify.

The Commonwealth called a police officer, Edward Mello, who testified that when he and Officer McDonald went to the scene of a reported shooting they were told by three people that the man who shot their friend went into an apartment across the street. Officers Mello and McDonald went to the apartment that had been indicated and found the defendant, with a woman wiping blood off his face. The officers had followed a trail of blood.

Officer Mello was asked:

"Q. Did you initiate any conversation with the defendant?"

A. No, sir.

Q. Did the defendant say anything to you, sir?

A. He just said that he got beat up by some friends.

Q. Did he relate any other incident to you that occurred that night shortly before?

A. No, sir.

Q. Did he relate any shooting?

A. No, sir.

---

1. While Sturgeon was the only witness who testified to this version of events, several other persons who arrived at the apartment with him had given similar accounts when questioned by the police.

2. *See, e.g., Commonwealth v. Cordeiro*, 401 Mass. 843, 519 N.E.2d 1328 (1988) (rape); *Commonwealth v. Fratus*, 385 Mass. 551, 432 N.E.2d 710 (1982) (murder); *Commonwealth v. Lewis*, 381 Mass. 411, 409 N.E.2d 771 (1980) (homicide); *Commonwealth v. Bettencourt*, 361 Mass. 515, 281 N.E.2d 220 (1972) (rape); *Commonwealth v. Pina*, 360 Mass. 139, 273 N.E.2d 806 (1971) (robbery); *Commonwealth v. Roselli*, 335 Mass. 38, 138 N.E.2d 607 (1956) (robbery).

Q. Did he relate any complaints about a disturbance in his apartment?

A. No, sir.

Q. Then what took place?

A. "I took him out of the house and placed him in the cruiser."

The defendant was then transported to the Fall River police station.

Officer Mello testified that there was no conversation with the defendant in the cruiser; and that when they arrived at the police station the defendant was advised of his rights. The defendant was then asked if he would like to make a statement, and he stated that he didn't. There was further conversation, and the defendant did make a statement, which was exculpatory in that he stated that there was a struggle between himself and the victim for the gun, during which struggle it fired into the victim's stomach. He then said that he didn't want to make any more statements until he was advised by an attorney and said that he had been injured and would like to be treated. He was thereupon sent to the Union Hospital.

In his closing argument the Assistant District Attorney, after reciting the evidence relating to the manner in which the Commonwealth alleged the shooting took place, argued as follows:

"Now, everyone scatters, including Mello (not Officer Mello), Wing and Greene. Greene tells us he is outside, he's upset. He told you what he did with Dias. Wing told you what he did with Dias. And Dias runs off to an apartment."

"Ask yourselves this: If you were there that night, and you ran to another apartment and the police came, would you tell them, 'I was just beat up'? Would you stop there, knowing that in your apartment someone has been shot, or a bullet was fired? Would you say, 'There's been an awful accident in my apartment. This is what happened; somebody has been accidentally shot'. Do you think you might say, 'I am okay, go back and see somebody in my apartment, I think he's hurt bad.' And if you don't say that, do you think there's a reason why you don't say that, do you think there's a reason why you don't say that to a police officer?"

*Commonwealth v. Dias,* No. 48536, slip op. at 1–4 (Mass.Super.Ct. Oct. 21, 1980), *available at* Resp't's Ex. 7. Sullivan did not object to the testimony and argument above, nor did he object to the prosecutor's assertion, in his closing argument, that Dias had stated that he was "going to kill someone." Pet. at 10–11. In fact, Dias stated that he was going to kill pigs, not humans. *Id.*

At the conclusion of the trial, Sullivan took exception to the emphasized jury instructions reprinted below:

[Friday, October 10, 1975.]

THE COURT: .... Now, you will decide the case based upon the evidence that you have heard, the exhibits that have been introduced before you. You may use what you saw on the view, and upon the law as I explain it to you.

I think by this time you know that it is your function and yours alone to determine factually what happened. It is your province and yours alone to determine what part—all, or part, or none— of the story that any witness or the opinion of any witness is expressed that you are going to believe and follow. This is your function, not mine.

At the outset, as in every criminal trial, as I told you before, the defendant, Mr. Dias, is presumed innocent. This means that you are to draw no inference against him by reason of the fact that he

was arrested, charged with a crime, indicted by a grand jury. As I told you earlier, a grand jury indictment is merely a mechanical procedural way of starting a criminal proceedings.

. . . .

The presumption of innocence also means that you are to draw no inference against the defendant if he chooses, as here, not to take the stand in his own behalf. He does not have to prove that he is innocent. He does not have to put on any witnesses if he does not want to. The Commonwealth has to prove that he is guilty, and the Commonwealth has to prove it beyond a reasonable doubt.

For example—and I will go into this a little more fully, perhaps, because, as you notice, I don't use any notes in the charge, even in a murder charge, I talk right off the cuff.

What this means is, that the defendant does not have the burden of convincing you that this killing was accidental or that, for example, somebody swung a gun, hit Dias' arm and the gun accidentally went off. He doesn't have to prove that.

The question that you will be asking yourselves eventually after I explain the law to you, is that in view of that testimony, if you believe it, when you weigh it against other evidence in the case, including the medical report, the ballistician's opinion, in view of that, are you convinced that the Commonwealth has proven the crime beyond a reasonable doubt.

And now the words, "beyond a reasonable doubt," are a legal shorthand expression that stands for the degree of certainty that is required in a criminal case, any criminal case, before a jury may convict a person of a crime, any crime.

The words, "beyond a reasonable doubt," do not mean that the Commonwealth has to prove that the defendant is guilty to a mathematical or to an absolute certainty. There would hardly ever be a case that is heard by a jury that there isn't some possibility that the defendant didn't do it.

What it rather means is that after discussing amongst yourselves all the evidence in the case, determining what part—all, none, or part—of the story any witness that you have heard on the stand you are going to believe. Before you may convict a defendant, you must be sure, you must be sure, to a moral certainty that he is guilty.

After reviewing all of the evidence, discussing it thoroughly amongst yourselves, if you have any serious unanswered questions about the defendant's guilt, then by law he must be given the benefit of the doubt and be acquitted.

. . . .

Now, the indictment, a copy of which you will have in the jury room with you, states that the grand jurors of the Commonwealth on their oath present that Gilbert Dias on or about the 16th day of March, 1974, at Fall River, in the County of Bristol, did assault and beat one Gerald Travis with intent to murder him, and by such assault and beating did kill and murder the said Gerald Travis.

Now, you will notice that nowhere in that indictment are the words, first degree murder or second degree murder.

The reason for that is that there is only one crime of murder. There are two degrees, which vary in their seriousness and in their punishment, as I will explain to you later. But there is only one crime known as murder.

And for the purpose of this case, it is the unlawful taking of the life of another human being with malice aforethought

and without sufficient circumstances as to reduce it to manslaughter. I will explain to you later what manslaughter is.

Notice, I said it is the unlawful taking of another human life with malice aforethought. Now again, malice aforethought is another legal shorthand expression that means and stands for this:

Either the specific intention to kill or to do serious bodily injury, or the doing of some act intentionally that we know in our common experience there is a grave likelihood if that act is done that either death or serious bodily injury will result. Again, it is either the specific intention to kill or do serious bodily injury.

An intent is what is in a person's mind—and I will go into that a little more fully—or the doing of an act, the intentional doing of an act which we all know from our common experience is so inherently dangerous that there is a grave likelihood that either death or serious bodily injury will result from the doing of that act.

For example, we know from our common experience that if you take a gun, whether it be a shotgun, rifle, or revolver, or pistol, and you load it, and you aim it at a person *or into a crowd,* and you pull the trigger, there is a serious likelihood that someone is going to get killed or seriously injured.

The law allows—and notice, I said, allows,—you to infer malice aforethought from the doing of an act, if you find it so, the intentional doing of an act, that we know is so inherently dangerous that a death or serious bodily injury will result.

Notice that I said the law allows you. It does not require you to infer malice aforethought. It allows you to if you, under all the circumstances, wish to.

And now, the crime that I have defined for you is second degree murder. First degree murder in the context of the evidence in the case, is the unlawful killing of a human being with deliberate, premeditated malice aforethought.

In order to convict a defendant of first degree murder, you must first find—and any time I say you must first find or must be convinced, it must be beyond a reasonable doubt—that there was a killing with malice aforethought, either with the specific intention to kill or to do serious bodily injury, or the intentional doing of an act that is so inherently dangerous as the law infers malice aforethought. But that in order to convict on first degree murder, there must be the added elements which the Commonwealth has to prove beyond a reasonable doubt. The Commonwealth has the burden not only of proving the murder, but the degree of murder.

There must be the added element of deliberate premeditation, which means in layman's language, that there must have been an intention formed and thought about, deliberated on, to kill or do serious bodily injury.

Now, there is no time requirement. I can't tell you that for first degree murder a person has to plan for five minutes or ten minutes, or three days, or five seconds. We all know that the human mind acts very rapidly.

But in order to find a person guilty of first degree murder, you must be convinced beyond a reasonable doubt that if it was murder as I explained it to you, that the murder was deliberately premeditated, thought about, for however long or short a period it took the defendant to meditate or to deliberate and to form the intent: I am going to kill or do serious bodily injury.

Again, I have talked about and will be talking about in the charge, about the word, "intent." This is what goes through a person's mind. But it is an element of every crime and must be proven just like anything else.

The way you determine what goes through a person's mind is from what he says or does not say, what he does or does not do. From that, you may infer intent or lack of it.

I have explained to you in general terms the crime of murder and first degree murder. The jury is the one who determines the degree of murder, not I, the District Attorney, or anybody else.

Now, let's attempt, if possible, to put that general definition of murder into the context of the testimony, the evidence that you have heard in this case.

. . . .

If you are convinced, after reviewing all of the evidence, that the defendant Dias went and got a gun, a shotgun, and loaded it and cocked it, and that from either these or other actions of his he had, for whatever period of time it took him to make up his mind, the intention, that he deliberately premeditated on killing and/or doing serious bodily harm with that gun, and that he did it, the you may—and notice, I say, may—not must—you would be warranted in finding him guilty of first degree murder.

Now, if you are not convinced that there was a sufficient deliberation, a sufficient planning in one's mind to form the intention, a specific intention, to deliberately premeditate and form the thought process, I am going to kill or do serious bodily injury, you may still consider as to whether he is guilty of first [sic] degree murder beyond a reasonable doubt.

You may consider as to whether if it were he who killed the victim—of course, I will go into this later—as to whether there was malice aforethought as I defined that term. Either the specific intention to kill although it may not have been deliberately premeditated upon, or the doing of an act that is so inherently dangerous that we know there is a serious likelihood that either death or serious injury will result. *For example, the shooting of a gun in a crowded room.*

We all know that if you intend to pull the trigger of a gun you know is loaded, if you know it is loaded, that there is a serious likelihood that someone is going to get seriously hurt or killed.

And if you find that the defendant, again, beyond a reasonable doubt, if you find it, he took a loaded gun and pulled the trigger, *whether he was aiming at anybody specifically or not in a crowded room,* you may find—notice, I say, may, not must—the requisite malice aforethought to convict him of murder in the second degree.

Now, again, you review all of the evidence. You determine whether or not you are convinced that he went around pointing the gun at people, threatening people, you know, to get them out, what he did or did not do, and determine whether or not he had the requisite malice aforethought, or whether or not you are going to infer the requisite malice aforethought from what he did in order to convict him of second degree murder.

Now, if you are not convinced that the Commonwealth has proven beyond a reasonable doubt either first degree murder or second degree murder as I defined it, inherent in every indictment for murder is the crime of manslaughter.

**112**

You see, there are two homicides— one, murder; and the other, manslaughter. Now, if you are not convinced beyond a reasonable doubt that the defendant is guilty of murder, you may ask yourselves, well, is he guilty of manslaughter.

Now, manslaughter in the context of this case, on the evidence, is the involuntary taking of another person's life, where there is no malice aforethought as I defined that term.

If, on the evidence, you are not convinced that there was murder here, but, for example, that you are convinced that the defendant took a gun in a broken position—either broken or unbroken, it doesn't really matter—and without intending that gun to be used in any way, or to do serious bodily injury to anyone; if what he did, *if you find that he went into a crowded room with a gun that he knew was loaded,* if you find that that was an act of wanton, willful, recklessness without specific malice aforethought, then if the gun kills somebody, you would be warranted in finding him guilty of manslaughter.

On the other hand, if you find that it was not a wanton, reckless act; for example, you are not convinced that what he did was wanton and reckless; for example, if you feel that at most what happened was that he started to walk through the room without any criminal intent, that he was going out to Taunton or wherever else he may have been going, and that a struggle ensued for the gun, that others, including the victim, tried to disarm him, and in the struggle the gun went off accidentally, then he is not guilty of anything.

And again, if you are convinced,— although I repeat to you again that the defendant doesn't have to convince you that the victim grabbed the gun and swung at Dias and hit his arm and it went off and shot him in the stomach,— but of course, if you are convinced that that's what happened, then again, Mr. Dias isn't guilty of any crime.

. . . .

[Bench conference held.]

. . . .

MR. SULLIVAN: .... You said shooting a gun in a crowded room. Now, that standing by itself, if someone is hurt by shooting a gun in a crowded room, unless there is a felony being committed, is not murder in the first degree or second degree.

THE COURT: It could be murder in the—

MR. SULLIVAN: Well, this is what is confusing. Because my notes indicate, you said shooting a gun in a crowded room.

THE COURT: Into a crowded room. I said that, I think, didn't I?

MR. GARTH [the Prosecutor]: Yes.

MR. SULLIVAN: I got it right down here—shooting a gun in a crowded room.

THE COURT: When I used a "crowded room" thing, I was talking about manslaughter.

MR. SULLIVAN: You didn't get into that.

THE COURT: I said into a crowd. I think I did.

MR. SULLIVAN: Will you correct that?

My exception, then.

EXCEPTION NO. 14

. . . .

[End of bench conference.]

THE COURT: There is one thing that was pointed out to me that I may not have made clear in the charge, and if

not, I will now correct it or try to make it clear now.

In order to convict the defendant Dias of first degree murder, you must be convinced beyond a reasonable doubt that his deliberative premeditation was to kill or do serious bodily injury to Travis, not to anybody else, not in general like I said for murder in the second degree.

You could infer malice aforethought out of shooting, if you wish to, out of shooting a loaded gun at a crowd, at people in general, without the specific intent to hit any specific individual.

For first degree, to find him guilty of first degree murder, you must be convinced, again, beyond a reasonable doubt, that if it was a murder, that he deliberately premeditated to kill or to do serious bodily injury with a gun to Travis.

. . . .

[The jury recessed at 12:40 p.m.]

[The jury returned at 2:25 p.m.]

. . . .

THE COURT: Mr. Foreman, and members of the jury. You have asked a question as follows:

"Please clearly designate the distinction between murder in the second degree and manslaughter."

*The principal distinction is that murder in the second degree requires that the jury find, again, beyond a reasonable doubt, that there was malice aforethought as I defined that term. And I will redefine it.*

*If you are convinced that Mr. Dias shot the gun that killed the victim, if you are convinced that when he did it he either had an intention to either kill or do serious bodily injury to someone in that room; or, if you find that, again, beyond a reasonable doubt, that*

*he used a weapon, he had a gun loaded and cocked and ready to fire, and that this is the type of an action that in our common experience we know that whether you intend to kill or not there is a serious likelihood that if the gun is fired, someone in that room is going to get seriously injured or killed, then from those facts, if you find them, the jury may infer malice aforethought. I said, "may," not "must."*

*What is happening is that the law feels that the use, the intentional use of a dangerous instrument, an instrument that is so dangerous that there is a serious likelihood of serious bodily injury or death, that from that action, if a jury wishes to, it may, because of the seriousness, find that the action was done with malice aforethought.*

*Now, the word, "malice," as used in that expression, malice aforethought, doesn't mean hatred in the ordinary lay sense. It does not include, for example, you do not have to find that the defendant hated or bore any ill will or malice in its ordinary term toward the victim.*

*It is a legal expression entirely, that means, as I told you, either a specific intention to kill or do serious bodily injury; or the doing of an act under such circumstances that we know is so serious that it will lead in all probability—that there is a serious likelihood it will lead to either death or bodily injury.*

*Now, the distinction between murder in the second degree as I have explained it to you and the manslaughter, is that for manslaughter, the element of malice aforethought must be absent, either the specific intent or the inference. You don't have to draw the inference. You may.*

*The crime of manslaughter in the context of the evidence that you have*

*heard in this case—because there is no other forms of manslaughter here where it would be self-defense or actions under provocation or passion; that is,—in the context of the evidence that you have heard, if you feel that there is no malice aforethought, but that what the defendant did, whatever you find he did, and in the circumstances that he did it, was a wanton, wilful, reckless act but not amounting to malice aforethought, and that as a result of his wanton, wilful, recklessness, a man gets killed, then you may find him guilty of manslaughter.*

*Have I answered the question? Of course, I want to also point out that if you find it was a pure accident, it was not a wanton, wilful, reckless act; pure accident, or it happened the other way, then he is not guilty of anything.*

. . . .

THE COURT: Are there any exceptions?

MR. SULLIVAN: I take exception to what you said.

THE COURT: Any specific part?

MR. SULLIVAN: No.

THE COURT: Just in general?

MR. SULLIVAN: Yes.

THE COURT: All right, you may have an exception.

. . . .

### EXCEPTION NO. 17

[The jury retired.]

[The jury returned at 6:10 p.m.]

THE COURT: Mr. Foreman, and members of the jury. You have asked another question, as follows:

"The question has come up as to whether the pushing aside of the barrel of the gun, presumably by Greene, constitutes a struggle; and if so, would it be cause to affect the vote as to second degree murder or manslaughter."

I think I will answer that in this way: the pushing [aside] of a gun, if you decide it happened, and/or whether or not there was a struggle, is not the primary issue or the primary question in determining whether the defendant is guilty of second degree murder or manslaughter.

If you remember, I told you that in order to find him guilty of second degree murder, that you must be convinced, again beyond a reasonable doubt, that whatever he did, he did with malice aforethought.

Malice aforethought, as I said, was either the intention, this is up in his mind—not what happened to a gun or didn't happen to a gun—the intention to either kill or do serious bodily injury or the doing of an act, he having a loaded gun and pointing it at people.

That, the law would allow you to infer, because there is a serious likelihood of serious bodily injury or death will result from the use of a gun, that the law would allow you to infer, if you wish, malice aforethought in the mind, in the actions of the defendant.

When you are thinking about a second degree murder, your primary concern should be what he did, not what somebody else did. Your primary concern should be, are you going to infer from or are you going to find from his actions that he either intended to kill or to seriously hurt somebody.

Or are you going to imply that he did by reason of the fact, if you find it to be a fact, that knowing a gun was loaded, he put himself with the gun in a position of pointing at people, and then no matter how the gun goes off, if he had malice aforethought, if you infer malice aforethought from his use of a gun.

Whether the gun was pushed aside or not momentarily is not your primary concern.

If you are not satisfied from his actions or saying what he did do or didn't that there was malice aforethought, that he either specifically intended to kill or to seriously hurt somebody, and that if you do not feel that you wish to infer malice aforethought from his use of the gun, *then in determining as to whether or not he is guilty of manslaughter, then you determine as to whether what he did was wilful, wanton, or reckless conduct.*

*And if so, your primary concern should be, is his going into a room with all those people with a gun either cocked or uncocked, or broken or unbroken, is that an act of wilful, wanton, reckless conduct.*

Because, you see, if you find that his conduct was not willful, wanton, or reckless, then you can arrive at the question as to how the gun went off, if it went off accidentally, completely accidentally. If you find that he was not guilty of wilful, wanton, reckless conduct, but that there was a tussle of some kind with the gun, including the pushing it aside or the leaping when they were trying to disarm him, if what he did was not wilful or wanton, but that the gun either in a struggle or some other way went off accidentally, it is a not guilty, it is not a manslaughter.

Have I answered your question?

THE COURT: All right, you may go back and resume your deliberations. As a matter of fact, very shortly, we have made arrangements to feed you for supper. So that in about ten minutes, we will be taking you out to eat.

. . . .

[Bench conference held.]

MR. SULLIVAN: Judge, I think in view of that question, that the case that was recently decided where the Supreme Court says in manslaughter unless the three aspects are present: passion, anger, there is no touching, that if you instruct them that if those elements are absent and there is no touching and it is accidental, it is not guilty.

THE COURT: That case on its facts is not a factual situation which would call here for that type of instruction. I am not going to say any more about it than I already have.

You may have an exception.

EXCEPTION NO. 18

[End of bench conference.]

[The jury retired.]

Resp't's Ex. 2, at 487–514 (emphasis added).

Dias was convicted of second-degree murder at 6:40 p.m. on Friday, October 10, 1975. *Id.* at 515. On October 14, 1975, Justice Brogna sentenced Dias to the mandatory term of life in prison, *id.* at 521; Mass.Gen.Laws ch. 265, § 2 (murder), with fifteen years to serve before becoming eligible for parole, *id.* ch. 127, § 133A (parole).

**2. Direct Appeals**

Dias, by his attorney Sullivan, filed an appeal of his conviction in the Appeals Court on October 28, 1975. Resp't's Ex. 3, at 5. On August 18, 1976, Sullivan assigned three errors: (i) the trial justice asked questions of a witness and made a remark that was prejudicial; (ii) the trial justice improperly instructed the jury with respect to the distinction between second-degree murder and manslaughter; and (iii) the trial justice failed to instruct the jury that if the elements of passion and anger are not present and there is no touching,

and the killing is accidental, the verdict is not guilty. *Id.* at 6–7. When Sullivan submitted the brief on Dias's behalf, however, he waived the second and third assignments of error and substituted a new issue: Whether the evidence called for the entry of a verdict of a lesser degree of guilt. *Id.* at 1–2. Through Sullivan, Dias requested that "the Court exercise its power under General Laws Chapter 278 Section 33E to reduce the murder conviction to manslaughter." *Id.* at 11. He argued that "[a]n examination of all the facts discloses that there has been a 'miscarriage of justice' in convicting the defendant of murder in the second degree, and that a verdict of manslaughter would be more 'consonant with justice,' *Commonwealth v. Baker,* 346 Mass. 107, 109, 190 N.E.2d 555, (1963)." *Id.*

The Supreme Judicial Court, on its own initiative, ordered direct appellate review. *Commonwealth v. Dias,* 373 Mass. 412, 413, 367 N.E.2d 623 (1977), *available at* Resp't's Ex. 5. With respect to the issue of allegedly prejudicial questions and remarks by the trial justice, the Supreme Judicial Court held that the remarks of the trial justice were not biased, "they were aimed at developing the most trustworthy testimony and clarifying for the jury the witness's testimony." *Id.* at 417, 367 N.E.2d 623. Moreover, any possibly prejudicial effect of the judge's questioning was overcome through the judge's instruction to the jury that they alone were the finders of fact. *Id.* With respect to Dias's request under section 33E, the Supreme Judicial Court examined all the evidence in the trial; the jury instructions on murder, manslaughter, and accidental death; and other cases presenting similar factual scenarios and concluded that the verdict of murder in the second degree was appropriate. *Id.* at 417–19, 367 N.E.2d 623.

Dissatisfied with Sullivan, Dias retained new counsel, Barry Haight ("Haight"). *See Dias v. DuBois,* slip op. at 8–9; Pet. at 2; Answer ¶ 15(f). On Dias's behalf, Haight filed a petition in the Supreme Judicial Court for a writ of error on May 22, 1979, stating as its grounds, "miranda violations and prosecutor's improper closing arguments." *See* Form Pet. at 3; Resp't's Ex. 6; *Dias v. DuBois,* slip op. at 9. On June 19, 1980, a single justice of the Supreme Judicial Court stayed the petition until further order of the court or until Dias had exhausted other available remedies. Resp't's Ex. 6.

### 3. Collateral Proceedings

### a. First Motion for New Trial

Haight filed a motion for new trial on Dias's behalf on July 7, 1980. *Id.* Ex. 1, at 3. The motion asserted that: (i) a police officer's testimony about Dias's custodial statements violated Dias's *Miranda* rights; (ii) the prosecutor's comments on Dias's silence and absence of protestations of innocence at trial infringed Dias's Fifth Amendment rights; and (iii) the evidence was insufficient to support finding Dias guilty of second degree murder. Resp't's Ex. 7, at 4–6; Am. Ans. at 1–2. On October 21, 1980, Justice Brogna denied the motion for a new trial. Resp't's Ex. 7, at 1. With respect to the police testimony, Justice Brogna reasoned that Dias freely volunteered his statements to the police and that the statements were exculpatory. *Id.* at 5. With respect to the prosecutorial comments at trial, Justice Brogna reasoned that it was fair for the prosecution to point out to the jury that Dias's voluntary statements to the police were not full and complete. *Id.* Justice Brogna did not directly address whether there was sufficient evidence to support the conviction, but he noted that the Supreme Judicial Court had affirmed the conviction upon

plenary review. *Id.* at 6–7. Dias did not appeal the denial of this motion for a new trial. *Id.* Ex. 1, at 3A.

### b. Second Motion for New Trial

Dias, pro se, filed a second motion for new trial, along with a motion for appointment of counsel, on July 11, 1983. *Id.; Dias v. DuBois,* slip op. at 10. On September 21, 1983, the Superior Court appointed Armand Fernandes ("Fernandes") to represent Dias. Resp't's Ex. 1, at 4. In his memorandum in support of Dias's motion for new trial, filed on November 23, 1984, Fernandes raised four issues: (i) the jury charge failed to place the burden of proving malice on the Commonwealth and failed to instruct the jury that malice must be proven beyond a reasonable doubt; (ii) the jury charge failed properly to define, distinguish between, and include all lesser charges included in the greater offense of murder in the first degree; (iii) the justice gave instructions that forced the jury into a premature verdict; and (iv) Dias's conviction violated the Constitutions of the United States and the Commonwealth of Massachusetts because the Commonwealth failed to comply with the court-ordered psychiatric exam of Dias, or to sustain its burden of showing that Dias was competent to stand trial. *Id.* Ex. 8, at 3–4. The Commonwealth failed to submit a brief in opposition to the second motion for new trial. *Id.* Ex. 9, at 3 n. 1.

Justice Chris Byron granted the second motion for new trial on March 22, 1985. *Id.* Ex. 9, at 8. Justice Byron noted that because all of the issues raised by the second motion for new trial could have been, but were not, raised in the first motion for new trial, they were waived under Massachusetts Rule of Criminal Procedure 30, absent permission from a justice to raise them in a subsequent motion. *Id.* at 3. Although Justice Byron allowed Dias to raise all four issues, he only addressed the last issue because he found it dispositive. *Id.* at 4. Justice Byron required a new trial preceded by a competency hearing, reasoning that the Commonwealth never proved that Dias was competent to stand trial as required by the Fourteenth Amendment and despite a court order requiring a competency examination before trial. *Id.* at 6. In response to Dias's argument that a psychiatric examination "could have revealed" that Dias lacked the criminal intent to commit murder, however, Justice Byron noted that the record did not support a finding that Dias was insane at the time of the murder. *Id.* at 6–8. Justice Byron concluded that "the court is not persuaded that the failure to complete a psychiatric evaluation that *might* have revealed an insanity defense is a problem of constitutional magnitude," and rejected Dias's argument that reversal of the conviction and dismissal of the indictment were warranted. *Id.* at 8.

On April 17, 1985, Dias filed a claim of appeal and objections to the portion of Justice Byron's order that refused to dismiss the indictment and to release him from custody. *Id.* Ex. 1, at 4A; *see also id.* Ex. 12, at 3. On April 19, 1985, the Commonwealth appealed Justice Byron's order for a new trial. *Id.* Ex. 1, at 4A; *see also id.* Exs. 10–11.

On May 10, 1985, the Superior Court ordered a competency examination and released Dias on $40,000 bail with surety of $4,000 cash.[3] *Id.* Ex. 1, at 4A. On May 14, 1985, a psychiatrist found Dias competent to stand trial. *Id.* Ex. 11, at 21–22.

---

**3.** Sometime after his release on bail, Dias moved to Texas. Dias Aff. ¶¶ 20–21; *Dias v.*

*DuBois,* slip op. at 13.

On its own initiative, the Supreme Judicial Court ordered direct appellate review; affirmed the order declining to dismiss the indictment; reversed the order granting a new trial; and remanded for consideration of the remaining three issues raised in Fernandes's brief. *Commonwealth v. Dias*, 402 Mass. 645, 649, 524 N.E.2d 846 (1988), *available at* Resp't's Ex. 13. With respect to Dias's competency to stand trial, the court held that Justice Byron had erred when he focused on Dias's competency at the time of arraignment—when the trial court ordered a competency examination—rather than on the time of trial, more than fifteen months later. *Id.* at 647, 524 N.E.2d 846. The court noted that neither Dias's trial counsel, Sullivan, nor the trial justice, ever raised the issue of Dias's competency to stand trial, and that nothing in the trial transcript supported the inference that Dias was then incompetent to stand trial. *Id.*

On remand, Justice Byron summarily rejected the three remaining issues and endorsed a warrant for Dias's return to prison on October 25, 1988. Resp't's Ex. 1, at 5A. Dias returned to prison in Massachusetts in March 1989. *Id.* Ex. 15, at 1.

Dissatisfied with Fernandes, Dias retained new counsel, Lois Lewis ("Lewis"). On September 3, 1992, Lewis filed a petition requesting a late appeal on Dias's behalf. *Id.* Ex. 18. Lewis raised five issues: (i) Dias was denied a speedy trial after his motion for new trial was granted; (ii) the Appeals Court should have dismissed the Commonwealth's appeal of the order granting a new trial because the Commonwealth failed to pursue the appeal in a timely manner; (iii) Justice Byron should have explained his reasons for dismissing on remand the three jury-instruction issues raised in the second motion for new trial; (iv) Dias was never advised that Justice Byron had denied the remainder of

his second motion for new trial; and (v) the trial court gave improper jury instructions. *Id.* at 5–6. On January 4, 1993, Justice Greaney of the Supreme Judicial Court denied this petition. *Id.* Ex. 21. On July 20, 1993, through Lewis, Dias filed a motion to clarify whether the appeal had been denied on the merits or for reasons of procedural default. *Id.* Ex. 22. The Supreme Judicial Court does not appear to have responded to this motion to clarify. *Id.* Ex. 23.

### c. Other Court Proceedings

Dias, pro se, filed several other motions and civil actions tangentially related to his second motion for new trial. Upon his return to prison, after the Supreme Judicial Court's reversal of Justice Byron's order granting a new trial, Dias filed a motion in the Superior Court to correct his sentence to credit him with the time he had spent out on bail. *See Dias v. DuBois*, slip op. at 14–15; Resp't's Exs. 24–26. Not long after, Dias filed a civil action in federal court asserting various civil rights violations including illegal incarceration, cruel and unusual punishment, denial of access to the courts, and denial of access to personal property and mail. *See Dias v. DuBois*, slip op. at 15. Dias's claims in both state and federal court were unsuccessful. *See id.* at 15–16; *Dias v. Vose*, 960 F.2d 143, 1992 WL 83270 (1st Cir. Mar.3, 1992) (unpublished table decision); Resp't's Exs. 15, 17.

### d. First Federal Habeas Petition

Dias, pro se, filed his first federal habeas corpus petition in the District of Massachusetts in 1993. Judge Woodlock construed the petition as raising the following claims: (i) violation of due process and the right to trial by jury because of erroneous jury instructions; (ii) violation of the privilege against self-incrimination because of

police testimony concerning Dias's post-arrest statement, failure to hold a pre-trial voluntariness hearing, and prosecutorial commentary on silence; (iii) insufficient evidence to support a finding of second degree murder; (iv) denial of due process through the "dynamite" charge, in which the trial justice encouraged the jurors to return a verdict quickly; (v) denial of due process because of the Commonwealth's failure to conduct a court-ordered psychiatric examination prior to trial; (vi) denial of due process because of the Commonwealth's untimely appeal of the order granting a new trial; (vii) denial of the right to a speedy trial after the order granting a new trial; and (viii) denial of due process because of Dias's return to custody without an opportunity to be heard. *Dias v. DuBois,* slip op. at 17–19.

In a lengthy and thoughtful opinion, Judge Woodlock suggested that Dias had a strong claim that the instructions of the trial justice had improperly relieved the prosecution of its burden of proving malice aforethought beyond a reasonable doubt, *id.* at 40–41, but he held that Dias had failed to exhaust all of his state remedies, especially with respect to his claim of ineffective assistance of counsel, *id.* at 41–42. Accordingly, the district court characterized Dias's petition as a "mixed" petition that combined exhausted and unexhausted claims and dismissed the petition on February 26, 1996. *Id.* at 42 (citing *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 [1982] ).

### e. Third Motion for New Trial

Dias, pro se, filed a third motion for new trial and an evidentiary hearing in the Superior Court on December 10, 1996. Resp't's Ex. 1, at 5A; *id.* Ex. 28. He raised five issues: (i) ineffective assistance of counsel by Sullivan; (ii) ineffective assistance of counsel by Haight; (iii) ineffec-

tive assistance of counsel by Fernandes; (iv) improper jury instructions; and (v) due process violations when he was returned to prison without representation or an opportunity to be heard, either at the time he was returned to prison or later on his late appeal. *Id.* Ex. 28, at 1–5; *see also id.* Ex. 29 (brief in opposition); *id.* Ex. 30 (brief in reply).

Justice Philip Rivard–Rapoza granted Dias an oral argument on November 20, 1997, Pet'r's Ex. 20, but he denied Dias's third motion for new trial on June 16, 1998, Resp't's Ex. 31, at 1. No evidentiary hearing was held because Dias had failed to prove that there were substantial issues that would merit such a hearing. *Id.* at 7–8. With respect to Sullivan's effectiveness, Justice Rivard–Rapoza first noted that several issues already had been decided by Justice Brogna on the first motion for new trial, by the Supreme Judicial Court on appeal from the second motion for new trial, and by Justice Byron on remand from that court: (i) Sullivan's failure to call witnesses; (ii) Sullivan's failure to secure a competency hearing as ordered by the court; (iii) Sullivan's failure to raise the issue of *Miranda* with the trial court; (iv) Sullivan's waiver of a hearing on the voluntariness of Dias's statements to the police; and (v) Sullivan's failure to raise on appeal the jury instructions on manslaughter. *Compare id.* at 6, *with* Resp't's Ex. 28, at 1–2. Justice Rivard–Rapoza held that only one issue had not been earlier decided: whether Sullivan deprived Dias of the right to testify at his own trial. *Id.* Ex. 31, at 6. Noting that a defendant's testimonial privilege is a fundamental right, *id.* at 10 (citing *Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 28 L.Ed.2d 1 [1971] ), Justice Rivard–Rapoza found that the record was devoid of any evidence supporting Dias's argument that he wanted to testify in his own defense but was prevented from doing so, *id.* With respect

to Haight and Fernandes, Justice Rivard–Rapoza held that they were not ineffective. *Id.* at 11–21. With respect to the jury instructions, Justice Rivard–Rapoza held that the issue had already been decided by the Supreme Judicial Court on direct appeal, by Justice Byron on remand, and by Justice Greaney on the petition requesting a late appeal from the second motion for new trial. *Id.* at 5–6. With respect to Dias's return to prison, Justice Rivard–Rapoza held that because Dias was simply being ordered to serve a sentence that had been imposed previously, due process did not require that he be represented or heard. *Id.* at 21. As for Justice Greaney's denial of Dias's late appeal, Justice Rivard–Rapoza held that Justice Greaney merely applied a valid rule of state appellate procedure. *Id.* at 22 (citing Mass. R.App.P. 14[B]).

Dias, pro se, appealed the denial of his third motion for new trial to the Appeals Court around July 1998. *Id.* Ex. 1, at 6; *see also id.* Ex. 32 (brief on appeal filed Aug. 17, 1998); *id.* Ex. 33 (brief in opposition filed Nov. 1998); *id.* Ex. 34 (brief in reply filed Dec. 30, 1998). The Appeals Court denied Dias's appeal on October 28, 1999. *Commonwealth v. Dias,* No. 98–P–1275, slip op. (Mass.App.Ct. Oct. 28, 1999), *available at* Resp't's Ex. 35 [hereinafter *Dias III* ]; *see also Commonwealth v. Dias,* 48 Mass.App.Ct. 1105, 718 N.E.2d 896 (1999) (unpublished table decision). With respect to the issue of an evidentiary hearing, the Appeals Court deferred to the sound discretion of the Superior Court. *Dias III,* slip op. at 3 n. 3. With respect to Sullivan's effectiveness, the Appeals Court reviewed each of the issues Dias raised in his motion, including the issues that the Superior Court did not address. The Appeals Court refused to hold that Sullivan's failure to call certain witnesses constituted ineffective assistance of counsel because Dias provided no evidence as to what those witnesses would have said. *Id.* at 6–7, 367 N.E.2d 623. With respect to Sullivan's alleged refusal to let Dias testify in his own defense, the Appeals Court held that the Superior Court did not abuse its discretion when it found that Dias failed to support his contention with any evidence. *Id.* at 7, 367 N.E.2d 623. With respect to Sullivan's failure to object to the prosecutor's closing argument, the Appeals Court ruled that the prosecutor had not said anything objectionable and that failure to object could not have resulted in a substantial risk of miscarriage of justice. *Id.* at 8, 367 N.E.2d 623. With respect to Sullivan's failure to raise the issue of *Miranda,* the Appeals Court noted that Justice Brogna, in deciding the first motion for new trial, had ruled that there had been no *Miranda* violation and that Dias never appealed this decision. *Id.* at 15–16, 490 N.E.2d 1195. With respect to Haight and Fernandes, the Appeals Court held that they were not ineffective. *Id.* at 8–11, 490 N.E.2d 1195. With respect to the jury instructions, the Appeals Court noted that the Superior Court improperly considered the issue because the Supreme Judicial Court had earlier addressed the issue on direct appeal, Justice Greaney had considered the issue on the petition for a late appeal from the second motion for new trial, and Dias failed to appeal Justice Greaney's decision. *Id.* at 10–12, 490 N.E.2d 1195. The Appeals Court did, however, examine the jury instructions to see if they created a substantial risk of a miscarriage of justice, but it concluded that they did not. *Id.* at 12–15, 490 N.E.2d 1195. With respect to Dias's return to prison, the Appeals Court agreed with the Superior Court that because Dias was simply being ordered to serve a sentence that previously had been imposed, due process did not require him to be

represented or heard. *Id.* at 16–17, 490 N.E.2d 1195.

Dias applied for further appellate review on November 17, 1999. *Id.* Ex. 36. The Supreme Judicial Court denied his application on January 7, 2000. *Id.* Ex. 37.

## II. PROCEDURAL POSTURE

On April 24, 2000, Dias petitioned this Court for a writ of habeas corpus, which permits relief to persons in custody, pursuant to the judgment of a state court, in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a).

### A. Applicability of Amendments to Section 2254

The parties have not specifically addressed whether the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, §§ 101–107, 110 Stat. 1214, 1217–26 (reforming habeas corpus statute), applies to the merits of this case. The Supreme Court has held that AEDPA is not retroactive and that it only applies to cases filed after its effective date of April 24, 1996, *Lindh v. Murphy,* 521 U.S. 320, 322–23, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

█ Dias's first petition to the District of Massachusetts was filed *before* AEDPA went into effect, but his petition was dismissed without prejudice for failure to exhaust state remedies. *Dias v. DuBois,* slip op. at 41–43. Dias pursued his state remedies and then filed the current petition *after* AEDPA went into effect. Thus, the Supreme Court has not explicitly addressed the question presented in this case: Does AEDPA apply to the second of two related habeas petitions whose filing dates straddle the effective date of AEDPA?

This Court holds that the current habeas statute, as amended by AEDPA, governs the instant petition, even though Dias's original petition was filed in the pre-AEDPA era. Although the First Circuit has not addressed this precise question with respect to petitions filed under section 2254, its discussion of an analogous situation under section 2255 is indistinguishable from the facts of this case. *See Pratt v. United States,* 129 F.3d 54, 58–60 (1st Cir.1997) (applying AEDPA to the second of two petitions under section 2255 that straddled AEDPA's effective date), *cited with approval in Libby v. Magnusson,* 177 F.3d 43, 46–47 (1st Cir.1999) (holding that petitioner did not objectively rely to his detriment when he did not file his second petition under section 2255 before AEDPA's effective date). Other courts have explicitly held, as this Court does now, that a federal habeas corpus petition filed after the effective date of AEDPA is governed by AEDPA even though the petitioner's previous federal petition was filed before the effective date of AEDPA and was dismissed without prejudice for failure to exhaust state remedies. *Weaver v. Bowersox,* 241 F.3d 1024, 1029 (8th Cir.2001); *Barrientes v. Johnson,* 221 F.3d 741, 751 (5th Cir.2000), *cert. dismissed,* — U.S. —, 121 S.Ct. 902, 148 L.Ed.2d 948 (2001); *Mancuso v. Herbert,* 166 F.3d 97, 101 (2d Cir.1999) (citing, inter alia, *Pratt,* 129 F.3d at 58).

### B. Procedural Bars Under Section 2254

█ Dias's petition is not barred by any of the new procedural hurdles that Congress erected in AEDPA. The petition is not "second or successive," 28 U.S.C. § 2244(b)(1), because the earlier petition was dismissed for failure to exhaust state remedies, *Sustache–Rivera v. United States,* 221 F.3d 8, 12–13 (1st Cir. 2000) (citing *Slack v. McDaniel,* 529 U.S.

473, 485–89, 120 S.Ct. 1595, 146 L.Ed.2d 542 [2000] [construing pre-AEDPA law] ), *cert. denied,* —— U.S. ——, 121 S.Ct. 1364, 149 L.Ed.2d 292 (2001), nor is it untimely, 28 U.S.C. § 2244(d)(1), *construed in Gaskins v. Duval,* 183 F.3d 8, 9 (1st Cir.1999) (creating one-year grace period, from date AEDPA went into effect, in which to file section 2254 petitions based on convictions made final before AEDPA went into effect) because, excluding the time that Dias spent pursuing his third motion for new trial,[4] less than one year has elapsed since AEDPA went into effect, *id.* § 2244(d)(2), *construed in Gaskins,* 183 F.3d at 9–10 (allowing grace period to be tolled). Furthermore, although this Court may not *grant* Dias's petition if Dias failed to exhaust the remedies available to him in state court over the past twenty-five years, *id.* § 2254(b)(1)(A), this Court may *deny* Dias's petition on the merits even if he failed to exhaust his state remedies, *id.* § 2254(b)(2).

### C. Standard of Review Under § 2254

#### 1. Claims Adjudicated on the Merits in a State Court

Section 2254 provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court interpreted the meaning of section 2254(d)(1) in *Terry Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (5–4 decision). *See Johnson v. Norton,* 249 F.3d 20, 25–29 (1st Cir.2001) (applying *Terry Williams* to petition challenging competence to stand trial); *Hurtado v. Tucker,*

---

4. At the conclusion of this memorandum, this Court will enter an order with respect to "Docket No. 3," which was filed on June 9, 2000. "Docket No. 3" is a form petition in compliance with Rule 2(c) of the Rules Governing Section 2254 Cases. "Docket No. 1," filed on April 24, 2000, is the typewritten petition by Dias that details his arguments. This Court treated "Docket No. 1" as an application to proceed in forma pauperis. Nevertheless, this Court deems the filing date of "Docket No. 1," or perhaps a few days earlier, to be the date Dias filed his petition for purposes of section 2244(d). *See Nichols v. Bowersox,* 172 F.3d 1068, 1076–77 (8th Cir. 1999) (en banc); *Jones v. Bertrand,* 171 F.3d 499, 503 (7th Cir.1999); *cf. Morales–Rivera v. United States,* 184 F.3d 109, 110–11 (1st Cir.1999) (extending *Houston v. Lack,* 487 U.S. 266, 108 S.Ct. 2379 [1988], to create mailbox rule for habeas petitions). If this Court deemed the filing date of "Docket No. 3" to be the date that Dias filed his petition for purposes of section 2244(d), then the petition would have been untimely: AEDPA went into effect on April 24, 1996 (day 115 of 1996); Dias filed his third motion for new trial on December 10, 1996 (day 345 of 1996); the Supreme Judicial Court denied application for further appellate review on January 7, 2000 (day 7 of 2000); Dias filed his typewritten petition for habeas corpus in this Court on April 24, 2000 (day 115 of 2000); and Dias filed his standardized petition for habeas corpus in this Court on June 9, 2000 (day 161 of 2000). Thus, Dias waited 230 days before filing his third motion for new trial and either 108 or 154 days before filing his petition for habeas corpus, for a total of 338 or 384 days, depending on which petition is deemed relevant for purposes of section 2244(d). This Court deems the correct total to be 338 days.

245 F.3d 7 (1st Cir.2001) (sufficiency of the evidence); *Phoenix v. Matesanz,* 233 F.3d 77 (1st Cir.2000) (ineffective assistance of counsel); *Williams v. Matesanz,* 230 F.3d 421 (1st Cir.2000) (jury instructions); *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998) (anticipating rule set forth in *Terry Williams* ); *Kibbe v. DuBois,* 120 F.Supp.2d 114, 118–21 (D.Mass.2000) (Gertner, J.) (granting habeas petition under *Terry Williams* standard and questioning *O'Brien* standard). The Supreme Court clarified that "clearly established Federal law, as determined by the Supreme Court of the United States" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Terry Williams,* 529 U.S. at 412, 120 S.Ct. 1495. The Supreme Court also gave independent meaning to the phrases "contrary to" and "unreasonable application of" found in section 2254(d)(1).

A state court decision would be "contrary to" clearly established federal law, as determined by a holding of the Supreme Court, if (i) the state court applied a rule that contradicted the governing law set forth in the Supreme Court's cases or (ii) the state court confronted a set of facts that was materially indistinguishable from a decision of the Supreme Court and yet arrived at a result different from the Supreme Court's precedent. *Id.* at 405–06, 120 S.Ct. 1495. In contrast, a state court decision applying the correct legal rule set forth in the Supreme Court's cases would not be "contrary to" clearly established federal law. *Id.* at 406, 120 S.Ct. 1495.

A state court decision would involve an "unreasonable application of" clearly established federal law, as determined by a holding of the Supreme Court, if the state court identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. *Id.* at 413, 120 S.Ct. 1495. An *unreasonable* application of federal law is different from an *incorrect* application of federal law. *Id.* at 410, 120 S.Ct. 1495. The test is not whether reasonable jurists would *all* agree that the state court's application of federal law was unreasonable, *id.* at 409–10, 120 S.Ct. 1495, because that would be too subjective; rather, the inquiry should be whether the state court's application of federal law was *objectively* unreasonable, *id.* at 410, 120 S.Ct. 1495.

The meaning of section 2254(d)(2) necessarily turns on section 2254(e)(1), which presumes that factual determinations by a state court are correct. In other words, a petition for habeas corpus cannot be granted on the basis of section 2254(d)(2) unless the federal court first holds that the state court's factual determinations were incorrect pursuant to section 2254(e)(1), as discussed below.

## 2. Facts Determined by a State Court

Section 2254 provides:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e).

The First Circuit interpreted the meaning of section 2254(e)(1) in *Coombs v. Maine,* 202 F.3d 14 (1st Cir.2000). For purposes of section 2254(e)(1), " 'factual issues' are defined as 'basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators.' " *Id.* at 18 (quoting, inter alia, *Townsend v. Sain,* 372 U.S. 293, 309 n. 6 , 83 S.Ct. 745, 9 L.Ed.2d 770 [1963], *overruled in part on other grounds by Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 [1992] ); *accord Thompson v. Keohane,* 516 U.S. 99, 109–10, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

The Supreme Court interpreted the meaning of section 2254(e)(2) in *Michael Williams v. Taylor,* 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (9–0 decision). *See Fryar v. Bissonnette,* 113 F.Supp.2d 175, 178 (D.Mass.2000) (Ponsor, J.). The Supreme Court held that a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel. *Michael Williams,* 529 U.S. at 432, 120 S.Ct. 1479. In other words, "failed to develop" means more than "did not develop." The purpose of the fault component of "failed" is to ensure that the prisoner undertakes his own diligent search for evidence. Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend upon whether those efforts could have been successful. *Id.* at 435, 120 S.Ct. 1479.

### 3. Ineffective Assistance of Counsel

Section 2254 provides:

(i) The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.

28 U.S.C. § 2254(i).

### D. Request for an Evidentiary Hearing

■ Dias requests an evidentiary hearing in this Court, apparently to develop his claim of ineffective assistance of counsel. As discussed below, *infra* pp. 51–60, Dias complains that his counsel (i) failed to call witnesses, (ii) denied Dias the right to testify, (iii) failed to object to the prosecutor's closing argument, and (iv) failed to raise issues on appeal. Under section 2254(e)(2), evidentiary hearings in federal court are rarely appropriate. Here, an evidentiary hearing would be inappropriate with respect to the third and fourth issues—whether counsel failed to object at trial or failed to raise issues on appeal—because those issues do not turn on "facts" "in the sense of a recital of external events and the credibility of their narrators," *Coombs,* 202 F.3d at 18, and thus can be evaluated on the basis of the written record. Nor would an evidentiary hearing be appropriate with respect to the second issue—whether counsel denied Dias the right to testify—because a state court determined that factual issue and Dias cannot rebut the presumption of that determination's correctness by clear and convincing evidence. 28 U.S.C.

§ 2254(e)(1). With respect to the first issue—counsel's failure to call witnesses—Dias might be able to escape the strict requirements of section 2254(e)(2) because he tried, without success, to obtain an evidentiary hearing on this issue on his third motion for new trial. Resp't's Ex. 31, at 7–8. Nevertheless, Dias cannot escape a more fundamental problem: He fails to allege facts which, if proved, would entitle him to relief.[5] *Stouffer v. Reynolds,* 168 F.3d 1155, 1168 (10th Cir.1999) (quoting *Townsend,* 372 U.S. at 312, 83 S.Ct. 745). In other words, taking the facts alleged by Dias as true, this Court may evaluate counsel's failure to call witnesses as matter of law, *Thompson,* 516 U.S. at 111, 116 S.Ct. 457 (citing *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052 [1984]), thus rendering an evidentiary hearing unnecessary. *Cf. United States v. McGill,* 11 F.3d 223, 225–26 (1st Cir.1993) (placing burden on petitioner under section 2255 to establish need for evidentiary hearing); *Perron v. Perrin,* 742 F.2d 669, 671–72 (1st Cir.1984) (holding that evidentiary hearing under section 2254 was unnecessary).

## III. DISCUSSION

Dias originally based his petition on nine enumerated issues, Pet. at 15–17 [hereinafter Issues I–IX]; Pet'r's Supplemental Mem. at 1 (citing *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 [2000]) [hereinafter Issue VII], which the respondent has broken into fifteen distinct claims, Am. Answer at 7–8 [hereinafter Claims 1–15]. In his form petition, Dias relied on five grounds. Form Pet. at 5 [hereinafter Grounds (e), (f), (g), (i), (j) ]. Construing the pro se petition liberally, *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam); *Raineri v. United States,* 233 F.3d 96, 97 (1st Cir.2000), this Court organizes the claims as follows, roughly based on chronology:

A. The Commonwealth denied Dias equal protection and due process when it failed to examine his competency to stand trial, as ordered by the Superior Court. Issue IX; Claim 15.

B. The prosecutor denied Dias his Fifth Amendment rights when he introduced police testimony at trial concerning Dias's post-arrest statement, in violation of *Miranda,* and when he commented during closing arguments on Dias's statements to the police. Issue VI; Claim 9; Ground (e).

C. The Superior Court denied Dias the right to a fair trial by giving improper jury instructions. Issue VII; Claims 11–13.

D. Trial counsel, Sullivan, deprived Dias of effective assistance, Ground (i), when he:

1. failed to investigate the witnesses and evidence prior to trial, Issue II(b);

2. failed to call eye-witnesses and a paid expert at trial in defense of Dias, Issue II(a); Claim 2–3;

3. failed to allow Dias to testify in his own defense at trial even though Dias informed trial counsel that he wanted to testify, Issue II(c); Claim 4; and

4. failed to object to the prosecutor's closing argument at trial, Issue II(d); Claim 5; and

5. waived constitutional issues (apparently on direct appeal), without

---

**5.** The affidavit submitted by Dias apparently is missing the third of its six pages, but there is no indication that the missing page includes facts critical to this determination. The facts relevant to whether counsel failed to call witnesses are found on the second page of the affidavit.

Dias's consent, that were properly objected to during trial (apparently regarding the jury instructions), Issue II(e)–(f); Claim 6.

E. With respect to Dias's second motion for new trial:

1. The Appeals Court denied Dias equal protection and due process when it allowed the Commonwealth to file an untimely appeal to the allowance of the second new trial motion. Issue VI(a); Claim 10.

2. The Superior Court denied Dias a speedy trial once it ordered a new trial. Issue VIII; Claim 14.

3. When the Superior Court returned Dias to prison following the reversal of the second motion for new trial, the Superior Court denied Dias:

a. due process by failing to secure Dias's presence, Issue IV; Claim 8;

b. due process by failing to provide Dias with counsel, Issue IV(a); Claim 8; and

c. the right to confrontation by holding a hearing outside his presence, Issue V; Claim 8.

4. "Appellate counsel" deprived Dias of effective assistance when he waived constitutional issues (apparently after the second motion for new trial was denied), without Dias's consent, that were properly objected to during trial (apparently regarding the jury instructions). Issue II(e)–(f); Claim 7.

5. The Supreme Judicial Court denied Dias equal protection when it denied Dias the right properly to appeal the decision of the Superior

Court. Issue III; Claim 7; Ground (j).

F. The motion justice denied Dias equal protection when he failed to hold an evidentiary hearing (apparently on Dias's third motion for new trial). Issue I; Claim 1.

In his form petition, Dias checked a box indicating that his conviction was "obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant," Ground (f), and he also checked a box indicating that his conviction was "obtained by a violation of the protection against double jeopardy," Ground (g). Dias provides this Court with absolutely nothing in support of these two claims and never raised the issue of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or the issue of double jeopardy in state court.[6] Thus, this Court will not discuss Grounds (f) and (g) further.

### A. Dias's Competence to Stand Trial

 The Supreme Judicial Court adjudicated Dias's competence to stand trial. Thus, this Court must review its decision pursuant to section 2254(d), as construed by *Terry Williams.* The Supreme Judicial Court held:

It appears that [Justice Byron on the second motion for new trial] viewed the arraignment judge's order [requesting a competency examination] as creating a substantial question of lack of competence at the time of trial which could be rebutted only by the hearing and find-

---

6. To the extent that Dias implies that his return to prison, after the Supreme Judicial Court reversed Justice Byron's allowance of the second motion for new trial, was a form of double jeopardy, he is incorrect. Justice Byron's decision allowing a new trial never became final, and even if it had become final,

the Supreme Court has long held that a new trial, after a conviction is reversed on appeal, is not double jeopardy. *Ball v. United States,* 163 U.S. 662, 671–72, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), *cited with approval in Lockhart v. Nelson,* 488 U.S. 33, 38, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

ings required by G.L. c. 123, § 15. We disagree that the facts of this case and the relevant law warrant such a conclusion and, therefore, conclude that the order granting a new trial was an error of law. See *Commonwealth v. Grace,* 397 Mass. 303, 307, 491 N.E.2d 246 (1986).

The defendant was arraigned in June, 1974. The reasons for the arraignment judge's order do not appear in the record, but we assume the existence of "a substantial question of possible doubt" at that time. *Commonwealth v. Crowley,* 393 Mass. [393, 399, 471 N.E.2d 353 (1984) (quoting *Rhay v. White,* 385 F.2d 883, 886 [9th Cir.1967] ) ]. However, the defendant was tried more than fifteen months later. Nothing in the record of that trial indicated that, in October, 1975, he lacked " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and … a rational as well as factual understanding of the proceedings against him.' " *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). At no point did the trial judge's "observations of the defendant's demeanor and behavior at the trial," *Commonwealth v. Crowley, supra* at 399, 471 N.E.2d 353, lead him to question the defendant's competence. Most significant in the context of the instant case, the defendant's trial counsel raised no issue concerning the defendant's conduct and mental condition. *Contrast id.* at 394, 471 N.E.2d 353.

We stress again that "the test set out in *Dusky* is concerned with *present* abilities. … [T]he question is whether [the defendant] was competent to stand trial at the *actual* time of trial" (emphasis added). *Commonwealth v. Kostka,* 370 Mass. 516, 522, 350 N.E.2d 444 (1976). The apparent failure to hold a hearing contemporaneously with his arraignment is not, in and of itself, a sufficient ground for concluding that a substantial question of doubt as to his competency existed at the time of trial. *Cf. Commonwealth v. DiMinico,* 375 Mass. 676, 377 N.E.2d 959 (1978). As we said with regard to G.L. c. 123, § 100A, as amended by St.1927, c. 59, the predecessor statute to G.L. c. 123, § 15, "noncompliance with the provisions of [the statute] does not invalidate the trial as matter of law." *Commonwealth v. Vallarelli,* 273 Mass. 240, 249, 173 N.E. 582 (1930).

*Commonwealth v. Dias,* 402 Mass. at 647–48, 524 N.E.2d 846. Dias does not present clear and convincing evidence that the facts recited by the Supreme Judicial Court are incorrect, 28 U.S.C. § 2254(e)(1); *see also id.* § 2254(d)(2), leaving only the question whether the decision was "contrary to" or involved an "unreasonable application of" clearly established federal law, as determined by a holding of the Supreme Court, *id.* § 2254(d)(1).

The decision of the Supreme Judicial Court was not "contrary to" clearly established federal law. *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam), still provides the correct test for determining competency to stand trial. *See Cooper v. Oklahoma,* 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). After the Supreme Court decided *Dusky,* but before the Supreme Judicial Court issued its decision on the matter of Dias's competence in 1988, the Supreme Court issued two other opinions on the question of competency to stand trial, *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), and *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). These two cases neither affect the rule set forth in *Dusky* nor present a set of facts analogous to the facts presented to the Supreme

Judicial Court, however. In particular, both *Drope* and *Robinson* involved a situation in which the competency of the defendant was questioned in front of the judge at the time of trial. *Drope*, 420 U.S. at 165–66, 95 S.Ct. 896; *Robinson*, 383 U.S. at 376–77, 86 S.Ct. 836. Thus, the decision of the Supreme Judicial Court was not "contrary to" clearly established federal law, as determined by the holdings of the Supreme Court. *Terry Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495.

Nor did the decision of the Supreme Judicial Court involve an "unreasonable application of" clearly established federal law. The opinion of the Supreme Judicial Court emphasized that the test set forth in *Dusky* is concerned with *present* abilities. The Supreme Judicial Court supported this proposition by citing *Dusky* and *Commonwealth v. Kostka*, 370 Mass. 516, 522, 350 N.E.2d 444 (1976), which in turn cites *Robinson*, 383 U.S. at 387, 86 S.Ct. 836. Both *Dusky* and *Robinson* focus on a defendant's cognitive abilities at the time of trial. *See Johnson*, 249 F.3d at 27–28. This Court cannot say that it was objectively unreasonable for the Supreme Judicial Court to do the same, *Terry Williams*, 529 U.S. at 410, 120 S.Ct. 1495.

## B. Dias's Fifth Amendment Rights

■ According to the Massachusetts Appeals Court, Dias waived his Fifth Amendment claims when he failed to file an appeal of Justice Brogna's decision on the first motion for new trial. *See Dias III*, slip op. at 15–16; *see also Phoenix*, 189 F.3d at 24 (looking to "last reasoned opinion" of state court to determine existence of independent and adequate state procedural rule [citing *Ylst v. Nunnemaker*, 501 U.S. 797, 801, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) ]). "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), *cited with approval in Edwards v. Carpenter*, 529 U.S. 446, 451–53, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000).

"[C]ause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," although ineffective assistance of counsel would also constitute cause. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), *quoted with approval in Strickler v. Greene*, 527 U.S. 263, 283 n. 24, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Prejudice requires the prisoner to convince the court that "there is a reasonable probability that the result of the trial would have been different," *Strickler*, 527 U.S. at 289, 119 S.Ct. 1936; "[t]he question is *not* whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence," *id.* at 289–90, 119 S.Ct. 1936 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555 [1995] ) (internal quotation marks omitted); *see also Prou v. United States*, 199 F.3d 37, 49 (1st Cir. 1999) (holding that defendant established cause and prejudice).

Dias presents no cause for his procedural default. Nor can he rely on Haight's allegedly ineffective assistance as the cause for his failure to appeal from the

collateral post-conviction proceeding. before Justice Brogna. *See* 28 U.S.C. § 2254(i); *Coleman,* 501 U.S. at 752–53, 111 S.Ct. 2546. Thus, this Court need not consider whether Dias was prejudiced by the alleged Fifth Amendment violations. Furthermore, this Court's failure to consider the Fifth Amendment claims will not result in a fundamental miscarriage of justice because Dias cannot show actual, as opposed to legal, innocence, to wit, that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup v. Delo,* 513 U.S. 298, 326–27, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (applying standard of *Murray,* 477 U.S. at 495–96, 106 S.Ct. 2639, to petitions alleging constitutionally-erroneous conviction), *cited with approval in Simpson v. Matesanz,* 175 F.3d 200, 210 (1st Cir.1999), *cert. denied,* 528 U.S. 1082, 120 S.Ct. 803, 145 L.Ed.2d 677 (2000). Thus, Dias cannot raise his Fifth Amendment claims in this Court.

## C. Dias's Right to Proper Jury Instructions

■ Judge Woodlock's pre-AEDPA opinion in *Dias v. DuBois* carefully analyzed both the jury instructions and the assistance of counsel at Dias's trial and concluded that both raised serious questions. In response to Judge Woodlock's opinion, Dias filed a third motion for new trial based on the jury instructions and the assistance of counsel. According to the Massachusetts Appeals Court, however, Dias waived his jury instruction claims when he failed to appeal Justice Greaney's decision rejecting the application for a late appeal from Justice Byron's decision on the second motion for new trial. *See Dias III,* slip op. at 10–15 (citing, inter alia, *Hicks v. Comm'r of Corr.,* 425 Mass. 1014, 1015, 681 N.E.2d 274 [1997] ). Although the Appeals Court reviewed the jury instructions to see if they created a substan-

tial risk of a miscarriage of justice, *id.* at 12–15; "[t]he mere fact that a state appellate court engages in a discretionary, and necessarily cursory, review under a 'miscarriage of justice' analysis does not in itself indicate that the court has determined to waive an independent state procedural ground for affirming the conviction," *Tart v. Massachusetts,* 949 F.2d 490, 496 (1st Cir.1991), *cited with approval in Simpson,* 175 F.3d at 209. Furthermore, a review of the Appeals Court decision reveals that it does not "fairly appear [ ] to rest primarily on federal law." *Coleman,* 501 U.S. at 734, 735, 111 S.Ct. 2546. Thus, for the reasons stated in this Court's review of Dias's Fifth Amendment claims, Dias cannot raise his jury instruction claims in this Court or rely on the allegedly ineffective assistance of Fernandes or Lewis as the cause for his failure either timely to appeal Justice Byron's decision or to appeal Justice Greaney's decision.

## D. Dias's Right to Effective Assistance of Counsel

To the extent that Dias complains about Haight, Fernandes, or Lewis, this Court cannot grant relief on the basis of their ineffectiveness. 28 U.S.C. § 2254(i). This Court may only consider the alleged ineffectiveness of Sullivan at trial, U.S. Const. amend. VI, and on appeal, *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), assuming Dias has not procedurally defaulted, *Edwards,* 529 U.S. at 450–51, 120 S.Ct. 1587 (holding that claim for ineffective assistance of counsel may be procedurally defaulted even if the ineffective assistance was the "cause" for another procedurally defaulted claim).

■ Because the Massachusetts Appeals Court adjudicated Dias's claim that Sullivan was ineffective at trial and on appeal, this Court must review the Ap-

peals Court's decision pursuant to section 2254(d), as construed by *Terry Williams*. The Appeals Court held:

1. *Ineffective assistance of counsel.* Dias could have raised in prior proceedings the issues presented in his third motion for new trial. When a defendant fails to timely raise a claim, the claim is waived. *Commonwealth v. Amirault*, 424 Mass. 618, 639, 677 N.E.2d 652 (1997). However, if the failure to raise a claim is due to ineffective assistance of counsel, the claim is preserved. *Ibid. Commonwealth v. Miranda*, 22 Mass. App.Ct. 10, 17–18, 490 N.E.2d 1195 (1986). Because Dias structures most of his claims in the guise of ineffective assistance of counsel, i.e., in his lawyers' failure to pursue issues on appeal and in collateral proceedings, we cannot summarily conclude that Dias has waived these claims.

Although Dias claims ineffective assistance under both art. 12 of the Massachusetts Declaration of Rights and the Sixth Amendment of the United States Constitution, we examine his claims only under the State standard set forth in *Commonwealth v. Saferian*, 366 Mass. 89, 96, 315 N.E.2d 878 (1974), because if that test is met, the Federal test is met as well. See *Commonwealth v. Hurley*, 391 Mass. 76, 81, 461 N.E.2d 754 (1984) (art. 12 provides greater safeguards against ineffective assistance than Bill of Rights); *Commonwealth v. Cardenuto*, 406 Mass. 450, 454 n. 8, 548 N.E.2d 864 (1990). We judge the performance of counsel, both trial and appellate, by whether "there has been serious incompetency, inefficiency, or inattention of counsel—behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer—and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defen[s]e." *Cardenuto, supra* at 453–454, 548 N.E.2d 864, quoting from *Saferian, supra* at 96, 315 N.E.2d 878. See *Commonwealth v. Richard*, 398 Mass. 392, 393, 496 N.E.2d 1366, cert. denied, 479 U.S. 1010, 107 S.Ct. 654, 93 L.Ed.2d 709 (1986) ("there ought to be some showing that better work might have accomplished something material for the defense," quoting from *Cepulonis v. Commonwealth*, 384 Mass. 495, 502, 427 N.E.2d 17 [1981], appeal dismissed, 455 U.S. 931, 102 S.Ct. 1416 [1982] ).

Where, as here, however, a defendant in a collateral proceeding claims ineffective assistance of counsel after plenary review under G.L. c. 278, § 33E, we review alleged omissions of counsel to see whether they present a substantial risk of a miscarriage of justice. See *Commonwealth v. Curtis*, 417 Mass. 619, 624 n. 4, 632 N.E.2d 821 (1994) ("if an omission of counsel does not present a substantial risk of a miscarriage of justice ... there is no basis for an ineffective assistance of counsel claim under either the Federal or the State Constitution"); *Amirault, supra* at 640–641, 652 n. 24, 677 N.E.2d 652 (same)

(a) *Ineffective assistance of counsel at trial.* We note that Dias should have claimed ineffectiveness of trial counsel in his first motion for a new trial [7]; however, Dias suggests, albeit unclearly, that his attorney on his first new trial motion was ineffective in failing to claim ineffective assistance of trial counsel. In view of this extended litigation, see *Common-*

---

7. Because Dias's trial counsel also represented Dias on direct appeal, Dias was not required to claim ineffective assistance in his direct appeal. See *Commonwealth v. Lanoue*, 409 Mass. 1, 3–4, 563 N.E.2d 1367 (1990).

wealth v. DeChristoforo, 371 Mass. 26, 33, 353 N.E.2d 769 (1976), and because claims against Dias's later counsel necessarily depend on whether trial counsel was ineffective, we review trial counsel's performance. See Breese v. Commonwealth, 415 Mass. 249, 252, 612 N.E.2d 1170 (1993).

(i) Failure to call witnesses. Dias claims that his trial counsel should have investigated and procured Cora Myers, George Souza, and Michael Costa as potential witnesses. However, there is no showing in the record before us as to the substance of the testimony Dias sought from these individuals. Thus, we cannot conclude that trial counsel's failure to procure these witnesses resulted in a substantial likelihood of a miscarriage of justice.[8] See Commonwealth v. Collins, 36 Mass.App.Ct. 25, 30, 627 N.E.2d 941 (1994) (defendant's failure to append new trial motion affidavits of potential witnesses precluded motion judge from ruling on ineffective assistance claim).

(ii) Denial of Dias's right to testify. Dias asserts that his counsel deprived him of the right to testify in his own defense. See Harris v. New York, 401 U.S. 222, 225, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Counsel allegedly informed Dias that in light of the medication Dias was then taking, it was best that he not testify. The third new trial motion judge rejected Dias's claim, which Dias has not raised in any other postconviction proceedings, because he found that there was no evidence that Dias wished to testify or that his decision to forego testifying was unknowing or involuntary.

Given that Dias's testimony would have been cumulative of other evidence, he concluded that denying the new trial motion would not likely result in a miscarriage of justice. We cannot say that the motion judge abused his discretion.

(iii) Failure to object to closing argument. Dias contends that his attorney's failure to object to the prosecutor's statements in his closing that Dias had stated he was "going to kill someone" constituted ineffective assistance.[9] However, in four of the five references that Dias finds objectionable, the prosecutor did not simply state that Dias had said he was "going to kill somebody," but instead correctly related that Dias had said he was going to kill a pig. The last reference relied upon by Dias, which is the last in sequence, is the only comment omitting specific mention of a pig. Even if failure to object to this could be deemed ineffective assistance of counsel, such failure to object could not have resulted in a substantial risk of a miscarriage of justice where the jury had heard the evidence and the prosecutor's four previous comments accurately referenced a pig.

(b) Ineffective assistance of counsel on direct appeal. Dias claims that his counsel on direct appeal, who also represented Dias at trial, should have raised specific objections to the jury charge. However, the Supreme Judicial Court found no error in the instructions in its review under G.L. c. 278, § 33E, and review under this provision is more favorable to a defendant than review un-

---

8. We note that their testimony may have been of questionable utility. A police officer testified that Cora Myers was not in the apartment at the time of the shooting. (Tr. at 101). A police report indicates that Michael Costa told the police he also was not in the apartment at the time of the shooting and that the police

had difficulty understanding him due to his intoxication.

9. The testimony on this point had been that Dias told others he was planning to go to Taunton on the day following the incident to kill a pig.

der the State and Federal standards for ineffective assistance of counsel. See *Commonwealth v. Wright,* 411 Mass. 678, 681–682, 584 N.E.2d 621 (1992); *Commonwealth v. Parker,* 420 Mass. 242, 246 n. 5, 649 N.E.2d 727 (1995). Dias cannot now succeed on review under a less favorable standard.

*Dias III,* slip op. at 4–8.

The Appeals Court's decision was not "contrary to" clearly established federal law. The test for ineffective assistance of counsel was, and still is, set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.,* at 687, 104 S.Ct. 2052.

> To establish ineffectiveness, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.,* at 688, 104 S.Ct. 2052. To establish prejudice he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 694, 104 S.Ct. 2052.

*Terry Williams,* 529 U.S. at 390–91, 120 S.Ct. 1495. Although the Appeals Court did not cite *Strickland* directly, it cited *Commonwealth v. Wright,* 411 Mass. 678,

584 N.E.2d 621 (1992), and *Commonwealth v. Cardenuto,* 406 Mass. 450, 548 N.E.2d 864 (1990), which in turn cite *Strickland* and state that the plenary review standard under section 33E of Massachusetts General Laws chapter 278, and the standard for ineffective assistance of counsel set forth in *Commonwealth v. Saferian,* 366 Mass. 89, 96, 315 N.E.2d 878 (1974), are at least as favorable to a defendant as the *Strickland* test. *Wright,* 411 Mass. at 681–82, 584 N.E.2d 621; *Cardenuto,* 406 Mass. at 454 n. 8, 548 N.E.2d 864. Thus, the Appeals Court did not apply a rule that contradicts the governing law set forth by the Supreme Court. *Terry Williams,* 529 U.S. at 405, 120 S.Ct. 1495. After the Supreme Court decided *Strickland,* but before the Appeals Court issued its decision in 1999, the Supreme Court applied the *Strickland* test in ten cases. See *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Lozada v. Deeds,* 498 U.S. 430, 111 S.Ct. 860, 112 L.Ed.2d 956 (1991) (per curiam); *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2678, 91 L.Ed.2d 397 (1986); *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986); *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). In *Dias III,* the Appeals Court neither confronted a set of facts materially indistinguishable from *Strickland* or the ten Supreme Court cases that had applied *Strickland*'s test nor arrived at a result different from this precedent.[10] *Terry*

---

**10.** In *Lockhart,* the Supreme Court held that

counsel, who admittedly was deficient, was

*Williams,* 529 U.S. at 406, 120 S.Ct. 1495. Thus, the Appeals Court's decision was not "contrary to" clearly established federal law. 28 U.S.C. § 2254(d)(1).

Nor did the Appeals Court's decision involve an "unreasonable application of" clearly established federal law. Although the Appeals Court did not directly apply federal law, the law that the Appeals Court did apply was not objectively unreasonable in light of *Strickland.* *Terry Williams,* 529 U.S. at 410, 120 S.Ct. 1495. In particular, it was not unreasonable for the Appeals Court to conclude that Dias failed to demonstrate that Sullivan was deficient by not calling certain witnesses at trial. The "decision whether to call a particular witness is almost always strategic," *Lema v.*

not constitutionally ineffective for failing to make an important objection at sentencing because the case that would have formed the basis for the objection was later overruled by the Eighth circuit, meaning that the petitioner could not show the Supreme Court that he was prejudiced by the deficient counsel. *Lockhart,* 506 U.S. at 368–72, 113 S.Ct. 838.

In *Coleman,* the Supreme Court held that counsel in state post-conviction proceedings cannot be ineffective because there is no constitutional right to an attorney in such proceedings. *Coleman,* 501 U.S. at 752–54, 111 S.Ct. 2546.

In *Lozada,* the Supreme Court held that the court of appeals erred in denying a prisoner a certificate of probable cause because the prisoner made a substantial showing that his counsel was ineffective. Counsel allegedly failed to inform the defendant of his right to appeal, his right to appointed counsel, and the procedures and time limitations for an appeal. *Lozada,* 498 U.S. at 430–31, 111 S.Ct. 860.

In *Burger,* the Supreme Court held that counsel who simultaneously represented two co-defendants was not ineffective, despite arguments of conflict of interest given counsel's failure to argue that one defendant was less culpable than the other, despite counsel's failure to present mitigating evidence at the sentencing hearing, and even though the defendants ultimately received death sentences. *Burger,* 483 U.S. at 781–96, 107 S.Ct. 3114.

In *Smith,* the Supreme Court held that counsel who decided not to assign any error concerning the admission of damaging testimony by a court-appointed psychiatrist because he thought state law would not support the argument, was not ineffective, even though the defendant ultimately received a death sentence. *Smith,* 477 U.S. at 534–36, 106 S.Ct. 2661.

In *Murray,* the Supreme Court held that a prisoner, who did not argue that he received

ineffective assistance of counsel, could not complain that he was barred from litigating an issue in federal court as a result of his counsel's inadvertent failure to raise the issue on direct appeal. *Murray,* 477 U.S. at 488–92, 497, 106 S.Ct. 2639.

In *Morrison,* the Supreme Court held that although habeas cannot be based on the Fourth Amendment, it can be based on counsel who failed to raise Fourth Amendment objections at trial. In particular, the Supreme Court held that counsel in a rape trial, who failed to object to the introduction of bed sheets taken from the defendant's apartment without a search warrant, was deficient because he failed to conduct any pretrial discovery and thus was unaware of the illegal search until the time of trial. *Morrison,* 477 U.S. at 383–87, 106 S.Ct. 2574. The Supreme Court remanded for further proceedings on whether the defendant was prejudiced by his counsel's deficiency.

In *Whiteside,* the Supreme Court held that counsel who refused to cooperate with the defendant in presenting perjured testimony at trial was not ineffective. *Whiteside,* 475 U.S. at 166–76, 106 S.Ct. 988.

In *Hill,* the Supreme Court held in general that a guilty plea might not be voluntary if it was made with the ineffective assistance of counsel, but held in particular that the prisoner failed to allege that he had relied on the advice of counsel so that there was no way the prisoner could show prejudice. *Hill,* 474 U.S. at 56–60, 106 S.Ct. 366.

In *Darden* and *Strickland,* the Supreme Court held that counsel at a sentencing hearing who relied solely on his client's statement, rather than presenting mitigating evidence, was not ineffective, even though the defendant ultimately received a death sentence. *Darden,* 477 U.S. at 184–87, 106 S.Ct. 2464; *Strickland,* 466 U.S. at 699–700, 104 S.Ct. 2052.

*United States*, 987 F.2d 48, 54 (1st Cir. 1993), *quoted with approval in Phoenix*, 233 F.3d at 83, and Dias concedes that Sullivan was well aware of the eyewitnesses that were not called, Dias Aff. ¶¶ 8, 11. Dias argues for the first time before this Court that Sullivan also failed to call an expert witness, *id.* ¶ 13, but again, Dias fails to demonstrate that Sullivan was deficient when he deliberately did not call such an expert to testify. In short, "[t]here is little reason to believe that [Sullivan's] failure to present the three witnesses proposed by [Dias] was anything other than a tactical decision." *Lema*, 987 F.2d at 54. Nor was it unreasonable for the Appeals Court to conclude that Dias was not prevented from testifying in his own defense given the unrebutted finding that Dias's failure to testify was neither unknowing nor involuntary. *See id.* at 52–53. Furthermore, it was not unreasonable for the Appeals Court to conclude that Sullivan was not ineffective for failing to object to the prosecutor's statements in closing arguments that Dias was "going to kill someone," given that such statements almost always explicitly referenced Dias's statements that he was going to kill a pig. *Cf. Darden*, 477 U.S. at 179–83, 106 S.Ct. 2464 & n. 7 (holding that prosecutor's statements, including, "It's the work of an animal, there's no doubt about it," did not deprive the petitioner of a fair trial.); *Therrien v. Vose*, 782 F.2d 1, 4 (1st Cir. 1986) (holding that prosecutor's statement—"What we are saying is we know he shot them."—did not warrant retrial.). Finally, it was not unreasonable for the Appeals Court to conclude that Sullivan was not ineffective on direct appeal for substituting specific objections to the jury instructions with a general objection to the conviction of murder in the second degree. *See Smith*, 477 U.S. at 534–36, 106 S.Ct. 2661.

## E. Dias's Procedural Rights on the Second Motion for New Trial

Dias also questions the constitutionality of the procedures used to return him to prison after Justice Byron allowed the second motion for new trial. Because the Massachusetts Appeals Court adjudicated these claims, this Court must review the Appeals Court's decision pursuant to section 2254(d), as construed by *Terry Williams*. The Appeals Court held:

(d) *Ineffective assistance of counsel on second new trial motion.* (i) *Failure to file motion to dismiss on speedy trial grounds.* Relying on Mass.R.Crim.P. 36(b), 378 Mass. 909 (1979), Dias contends that the attorney who handled his second motion for a new trial should have filed a motion to dismiss, because Dias did not timely receive a new trial after the Superior Court judge initially granted Dias's second motion for a new trial. However, the order for a new trial was not "final" within the meaning of the rule, so as to begin the tolling of days within which the Commonwealth must proceed, because the Commonwealth could still pursue a rehearing or an application for further appellate review. See *Commonwealth v. Levin*, 390 Mass. 857, 860–861, 460 N.E.2d 578 (1984). In fact, the Commonwealth timely appealed this order.[11]

Moreover, the guarantee of a speedy trial does not apply to the appellate process. *Commonwealth v. Hudson*,

---

11. Dias also suggests that counsel should have objected to the Commonwealth's appeal of the new trial order because the Commonwealth did not file a written opposition to the second new trial motion. However, the rec-

ord indicates that the Commonwealth participated at the argument on the motion, and Mass.R.Crim.P. 30(c)(8) grants an aggrieved party the right to appeal from an order for a new trial.

404 Mass. 282, 284, 535 N.E.2d 208 (1989). Thus, insofar as Dias claims that the time lag in the appellate process violated due process, Dias would have to show that the Commonwealth was purposefully dilatory or that "the delay, which was clearly inordinate, was significantly prejudicial." *Id.* at 285, 535 N.E.2d 208, quoting from *Commonwealth v. Weichel,* 403 Mass. 103, 109, 526 N.E.2d 760 (1988). Dias has not made any such showing.

. . . .

2. *Denial of due process at sentencing.* Dias was released from custody when the Superior Court initially granted his second motion for a new trial. After the Supreme Judicial Court reversed that order, the Commonwealth moved to have Dias returned to custody. The Superior Court granted the Commonwealth's motion in a hearing at which neither Dias nor his attorney was present. Dias contends that this action violated his State and Federal due process rights and also constituted an impermissible ex parte communication.

A successful appeal of a ruling in favor of the defendant merely reinstates the verdict or finding of guilt and does not subject the defendant to multiple punishments or re-prosecution. *United States v. Wilson,* 420 U.S. 332, 344–345, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). As noted by the motion judge, Dias did not receive a "new" sentence; he merely became subject to a sentence that had previously been lawfully imposed. Dias did not have a right to be present at such a collateral proceeding where his presence did not bear "any relation reasonably substantial to [his] opportunity to defend against the crime charged."

See *Commonwealth v. Bergstrom,* 402 Mass. 534, 544, 524 N.E.2d 366 (1988), citing *Commonwealth v. Millen,* 289 Mass. 441, 454–455, 194 N.E. 463 (1935) (no right to presence at motions for change of venue or for postponement of trial). Cf. *Commonwealth v. Barnoski,* 418 Mass. 523, 531, 638 N.E.2d 9 (1994) (hardship inquiries of prospective jurors was not "critical stage" at which defendant had right to be present); *Commonwealth v. Angiulo,* 415 Mass. 502, 530–531, 615 N.E.2d 155 (1993) (judge may perform administrative formalities outside presence of defendant but may not exclude defendant from inquiry about consequential matter).[12] Dias received all process due him when he was originally sentenced.

*Dias III,* slip op. at 9–10, 16–17. This Court cannot consider whether Fernandes and Lewis were ineffective during Dias's second motion for new trial, 28 U.S.C. § 2254(i), but this Court can review the Appeals Court's opinion to the extent that it considers the merits of Dias's claims with respect to his second motion for new trial.

■ First, Dias complains to this Court that the Commonwealth filed an untimely appeal from the allowance of his second motion for new trial. The Appeals Court held to the contrary, and because the issue is matter of state law, this Court cannot disturb the Appeals Court's holding. 28 U.S.C. § 2254(a); *Coleman,* 501 U.S. at 729–30, 111 S.Ct. 2546 (independent and adequate state grounds).

■ Next, Dias complains that he was denied his right to a speedy trial once a new trial was ordered. According to the Appeals Court, the order for a new trial

12. As Dias's due process claim fails, his claim that counsel was ineffective in failing to be present necessarily fails as well. Counsel's presence could not have accomplished any benefit for Dias.

was not "final" as matter of state law, *see* Mass.R.Crim.P. 36(b)(1)(D); *cf.* 18 U.S.C. § 3161(e) (requiring trial within seventy days after order for retrial becomes *final*), making the only question whether Dias was denied the right to a speedy *appeal.* The Appeals Court held that there is no right to a speedy *appeal. Dias III*, slip op. at 10 (citing *Commonwealth v. Hudson*, 404 Mass. 282, 284, 535 N.E.2d 208 [1989], which cites *Commonwealth v. Lee*, 394 Mass. 209, 220, 475 N.E.2d 363 [1985], which relies upon *Doescher v. Estelle*, 454 F.Supp. 943, 949–50 [N.D.Tex. 1978] [citing, inter alia, *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) ], *appeal dismissed*, 597 F.2d 281 [5th Cir.1979] ). The Appeals Court recognized, however, that there is a due process right against prejudicial delay. *Id.* (citing *Hudson*, 404 Mass. at 284, 535 N.E.2d 208, which quotes *Commonwealth v. Weichel*, 403 Mass. 103, 109, 526 N.E.2d 760 [1988], which in turn cites *Commonwealth v. Swenson*, 368 Mass. 268, 279–80, 331 N.E.2d 893 [1975] [citing *Odsen v. Moore*, 445 F.2d 806, 807 (1st Cir.1971) ] ). The test for a speedy trial under the Sixth Amendment was, and still is, set forth in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), *cited with approval in Doggett v. United States*, 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). Although the guarantee of a speedy trial applies even to those free on bail, *United States v. Loud Hawk*, 474 U.S. 302, 311 n. 13, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986), the Supreme Court has never stated that the Sixth Amendment applies to *appeals*. To the contrary, the Supreme Court has stated that "the Sixth Amendment right of the accused to a speedy trial has no application beyond the confines of a formal criminal *prosecution." Doggett*, 505 U.S. at 655, 112 S.Ct. 2686 (emphasis added). Accordingly, this Court cannot say that the Appeals Court's holding with respect to the Sixth Amendment was "contrary to" or an "unreasonable application of" clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). Nor can this Court say that the Appeals Court's holding with respect to due process was "contrary to" or "an unreasonable application of" clearly established federal law. *Id.* "The Sixth Amendment right to a speedy trial is ... not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected by the Due Process Clause and by statutes of limitations." *United States v. MacDonald*, 456 U.S. 1, 8, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982), *examined in Doggett*, 505 U.S. at 654–55, 112 S.Ct. 2686 & n. 2; *accord Marion*, 404 U.S. at 320–26, 92 S.Ct. 455, *examined in Doggett*, 505 U.S. at 654–55, 112 S.Ct. 2686. Despite this ostensible distinction, the Supreme Court has not set forth a due process test for speedy appeals. Without Supreme Court guidance, federal courts have conflated the right to a speedy trial under the Sixth Amendment and the due process clause by applying a modified version of the *Barker* test to post-conviction appeals. *E.g., Latimore v. Spencer*, 994 F.Supp. 60, 67–68 (D.Mass. 1998) (Harrington, J.) (citing, inter alia, *Harris v. Champion*, 15 F.3d 1538 [10th Cir.1994], and *United States v. Pratt*, 645 F.2d 89, 91 [1st Cir.1981] [citing, inter alia, *Odsen*, 445 F.2d at 807] ); *LeBlanc v. Grelotti*, 910 F.Supp. 826, 830 (D.Mass.1995) (Gertner, J.) (same). Under the modified *Barker* test, the ultimate inquiry is whether the defendant was prejudiced by the delay in the appeals process. This Court cannot say that it was objectively unreasonable for the Appeals Court to hold that Dias failed to show prejudice. Indeed, Dias benefitted from over three years of freedom which, as matter of law based on a written record, the Supreme Judicial Court held was allowed in error.

■ Next, Dias complains that his return to prison, after the Supreme Judicial Court reversed Justice Byron, was in violation of his rights to due process, counsel, and confrontation. Although the Appeals Court did not specifically address the issue, it is settled that there is no constitutional right to counsel in post-conviction proceedings. *Coleman*, 501 U.S. at 752–53, 111 S.Ct. 2546; *Pennsylvania v. Finley*, 481 U.S. 551, 551–52, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987); *see also* 28 U.S.C. § 2254(i). With respect to due process and the right to confrontation, the Appeals Court's decision was neither "contrary to" nor an "unreasonable application of" clearly established federal law, as determined by the Supreme Court. *Id.* § 2254(d)(1). The Supreme Court has not clearly addressed a prisoner's right to be present at a post-conviction hearing, but the First Circuit has held that a prisoner need not be present at all, so long as the procedures used by the state court do not violate fundamental fairness. *Oken v. Warden, MSP*, 233 F.3d 86, 91–96 (1st Cir.2000), *cert. denied*, — U.S. ——, 121 S.Ct. 1494, 149 L.Ed.2d 380 (2001). In this case, the hearing about which Dias complains was ministerial in nature; therefore, it was not objectively unreasonable for the Appeals Court to hold that Dias's presence was not required.

Finally, Dias complains that he was not allowed to appeal Justice Byron's denial of the second motion for new trial after remand from the Supreme Judicial Court. Dias does not state clearly the grounds for his claim, but to the extent that he complains about his counsel's failure to appeal, this Court cannot consider the claim. 28 U.S.C. § 2254(i). To the extent that Dias complains that he was not advised that Justice Byron had denied the remainder of his second motion for new trial, Dias waived this claim when he failed to appeal Justice Greaney's decision rejecting the application for a late appeal. *Dias III*, slip op. at 11.

**F. Dias's Right to an Evidentiary Hearing in State Court**

Dias claims that he was entitled to an evidentiary hearing in state court to develop the merits of his claims of ineffective assistance of counsel. The Massachusetts Appeals Court adjudicated this claim:

> Dias asserts that the motion judge erred in failing to hold an evidentiary hearing on this subject [ineffective assistance of counsel]. However, we defer to the sound discretion of the motion judge on this matter, and further note that an evidentiary hearing is not required where a defendant has made no showing of ineffective assistance of counsel. See *Commonwealth v. DeVincent*, 421 Mass. 64, 67, 653 N.E.2d 586 (1995).

*Dias III*, slip op. at 3 n. 3. The motion justice did not hold an evidentiary hearing because Dias made no showing that an evidentiary hearing would be necessary. Resp't's Ex. 31, at 7–8. This Court will not disturb the state court's procedure, *Connors v. Matesanz*, 49 F.Supp.2d 23, 26 (D.Mass.1999), and as discussed above, *supra* pp. 40–42, Dias is not entitled to an evidentiary hearing from this Court.

**IV. ORDER AND RULING**

The Court ORDERS that the formal petition for habeas corpus [Docket No. 3] be considered filed on April 24, 2000.

The petitions for habeas corpus [Docket No. 3] and an evidentiary hearing [Docket No. 18] are DENIED for the reasons stated above.